RECORD NO. 13-2367

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## NANCY K. WACTOR

*Plaintiff-Appellant,*

v.

## JACKSON NATIONAL LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

_____

## OPENING BRIEF OF PLAINTIFF-APPELLANT

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT ANDERSON

Gary D. Poliakoff
POLIAKIFF & ASSOCIATES, P.A.
P. O. Box 1571
Spartanburg, South Carolina 29304-0000
(864) 582-5472 (Telephone)
atty@gpoliakoff.com

Counsel for Plaintiff-Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2367__    Caption: __Nancy K. Wactor v. Jackson National Life Insurance Company__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Nancy K. Wactor__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Gary W. Poliakoff _____    Date: _____ 11/18/13 _____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
***************************

I certify that on _____ 11/18/13 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/Gary W. Poliakoff _____          _____ 11/18/13 _____
        (signature)                                    (date)

- 2 -

**TABLE OF CONTENTS**

Corporate Disclosure Statement

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Statement of the Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Discussion of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

    I.    **WHETHER THERE EXISTS ANY ISSUE OF MATERIAL FACT ON WHICH A JURY COULD FIND THAT PLAINTIFF IS ENTITLED TO THE INSURANCE COVERAGE AFFORDED BY THE POLICY, INCLUDING.** . . . . . . . . . . . . . . . . . . . . . . . .

        A.    **Whether the doctrine of Waiver applies (and whether questions of fact exist regarding the requirement for mailing notices and whether notices were received by the insured).** . . . . . . . . .    20

        B.    **Whether questions of fact exist regarding bad faith acts of Jackson National.** . . . . . . . . . . . . . .    27

        C.    **Whether questions of fact exist regarding Jackson National being estopped from cancellation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

        D.    **Whether questions of fact exist regarding good faith of Jackson National.** . . . . . . . . . . . . . .    32

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

Request for Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

Certificate of Compliance

Certificate of Filing and Service

## **TABLE OF AUTHORITIES**

### <u>Cases</u>

<u>Allen v. Jefferson Standard Life Ins. Co.</u>,
139 S.C. 41, 137 S.E. 214 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

<u>Blis Day Spa, LLC v. Hartford Ins. Group</u>,
427 F.Supp.2d 621 (W.D.N.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Carolina Aviation v. Glens Falls Ins. Co.</u>,
214 S.C. 222, 51 S.E.2d 757 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Charbonnages de France v. Smith</u>,
597 F.2d 406 (4th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Cock-N-Bull Steak House, Inc. v. Generali Ins. Co.</u>,
446 S.E.2d 727 (S.C. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Doe v. South Carolina Medical Malpractice Liability Joint
Underwriting Ass'n.</u>, 347 S.C. 642, 557 S.E.2d 670 (2001). . . . . . . . . . . 27, 28, 29

<u>Dubuque Fire & Marine Ins. Co. v. Miller</u>,
219 S.C. 17, 64 S.E.2d 8 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 30

<u>Edens v. South Carolina Farm Bureau Mutual Ins. Co.</u>,
279 S.C. 377, 308 S.E.2d 670 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21, 22

<u>Flynn v. Nationwide Mut. Ins. Co.</u>,
281 S.C. 391, 315 S.E.2d 817 (Ct. App. 1984). . . . . . . . . . . . . . . . . . . . 29, 32

<u>Gen. Accident Fire & Life Assurance Corp. Ltd. V. Akzona, Inc.</u>,
622 F.2d 90 (4th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Jennings v. Univ. of N.C.</u>,
482 F.3d 686 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Keith v. River Consulting Inc.</u>,
365 S.C. 500, 618 S.E.2d 302 (Ct. App. 2005). . . . . . . . . . . . . . . . . . . . 21

<u>Korean v. Nat'l Home Life Assurance Co.</u>,
277 S.C. 404, 288 S.E.2d 392 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Nichols v. State Farm Mut. Auto Ins. Co.,
279 S.C. 336, 306 S.E.2d 616 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Palmer v. Sovereign Camp, W.O.W.,
197 S.C. 379, 15 S.E.2d 655 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 30

Provident Life & Accident Ins. Co., v. Driver,
317 S.C. 471, 451 S.E.2d 924 (Ct. App. 1994). . . . . . . . . . . . . . . . . . . . . 30

Pierce v. Ford Motor Co.,
190 F.2d 910 (4th Cir. 1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Simmons v. Poe,
47 F.2d 1370 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tadlock Painting Co. v. Maryland Cas. Co.,
322 S.C. 498, 473 S.E.2d 52 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 28, 32

Univ. Med. Associates of the Med. Univ. of South Carolina v.
Unum Provident Corp., 335 F.Supp.2d 702 (D.S.C. 2004). . . . . . . . . . . . . 16, 28

iv

<u>Statutes and Court Rules</u>

Federal Rules of Evidence 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

S.C. Code § 38-59-20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

v

# STATEMENT OF JURISDICTION

Appellant Nancy K. Wactor filed her Complaint against Jackson National Life Insurance Company ("Jackson") on November 18, 2011, in United States District Court, District of South Carolina, Anderson Division, alleging Breach of the Life Insurance Contract, Equitable Estoppel, Unjust Enrichment, Insurance Bad Faith, and Breach of Duty of Good Faith and Fair Dealing. The Plaintiff Nancy K. Wactor and her late husband William R. Wactor, the insured, resided in Anderson County, South Carolina at the time of his death. The decedent's Estate is being administered in the Probate Court for Anderson County, South Carolina. Nancy K. Wactor is the Personal Representative of said Estate and is the sole beneficiary of the life insurance policy at issue in this case.

Defendant Jackson National Life Insurance Company is a Delaware corporation, authorized and doing business in the State of South Carolina, with its domestic headquarters located in Lansing, Michigan.

This is an action for damages in excess of Seventy-five Thousand Dollars ($75,000.00), exclusive of interest and costs, thus vesting the Court with jurisdiction under 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391.

On July 10, 2013 this Court filed an Order granting Jackson's Motion for Summary Judgment. Mrs. Wactor timely filed a Motion to Alter or Amend Judgment pursuant to Federal Rule of Civil Procedure 59. Said Motion was denied by Order filed October 8, 2013. Appellant timely complied with the Federal Rules of Appellate Procedure by filing a Notice of Appeal on November 6, 2013. The Order was a final decision of the District Court, and this Court has jurisdiction over Appellant's appeal of the Orders.

1

## STATEMENT OF THE ISSUES

1.      Whether there exists any issue of material fact on which a jury could find that Plaintiff is entitled to the insurance coverage afforded by the policy, including:

> (A)    Whether the doctrine of Waiver applies (and whether questions of fact exist regarding the requirement for mailing notices and whether notices were received by the insured).

> (B)    Whether questions of fact exist regarding bad faith acts of Jackson National.

> (C)    Whether questions of fact exist regarding Jackson National being estopped from cancellation.

> (D)    Whether questions of fact exist regarding good faith of Jackson National.

2

## STATEMENT OF THE CASE

William R. Wactor, deceased, paid approximately 19 years on a 20-year Term Life insurance policy (two 10-year terms, same policy).  Near the end of his life he developed dementia and cognitive loss, and missed the final two payments before his death.  He died on June 12, 2010. Defendant denied payment of the life insurance claim.

Plaintiff is decedent's widow, the sole beneficiary of the life insurance policy and the Personal Representative of his Estate.  Plaintiff brought this action alleging Breach of Contract, Equitable Estoppel, Unjust Enrichment, Insurance Bad Faith, and Breach of Duty of Good Faith and Fair Dealing.

The life insurance policy in question was issued to William R. Wactor by Defendant on March 25, 1991.  Over the next 19 years the insured paid the premiums, and some changes were made, including reduction of the face value from $400,000.00 to $200,000.00, and arranging for quarterly payments.  In recent years the quarterly payments were due January 25, April 25, July 25, and October 25.  It is undisputed that the insured paid the premium on October 25, 2009, and missed the payments on January 25 and April 25 of 2010.  It is also undisputed that on June 11, 2010, the day before Mr. Wactor died, Nancy Wactor telephoned the Defendant ("Jackson National"), requesting information as to whether her husband had made appropriate payments on the insurance policy, informing them of medical problems, and offering to make up any payments.  Jackson National informed her then that the policy was no longer in force and refused any further information.  (Wactor Phone Tr., J.A. at 194 - 198).

It is undisputed that Mr. Wactor paid the last quarterly payment of 2009 on October 25, 2009. By early 2010 Mr. Wactor, now age 74, was suffering from dementia and cognitive loss, as well as

3

Parkinson's Disease and other medical problems. On Christmas Day of 2009 Mrs. Wactor noticed

that ". . . he really seemed confused to me that day." (Wactor Depo, J.A. at 228 - 229).

In January of 2010 he was diagnosed with Parkinson's and cognitive problems. (Wactor Depo, J.A.

at 209). He was taking Aricept for cognitive loss. (Wactor Depo, J.A. at 210). From January of

2010 forward he would have lucid days sometimes and confused days. Sometimes he would have

lucidity and cognitive problems at times in the same day, and often the confusion was worse at

around 5:00 p.m. with "sundowners." The doctors were trying him on different medications, and

often the medication changes worsened his cognitive problems. (Wactor Depo, J. A. at 229 - 230).

In January and February of 2010 there were times that the treating doctors noted "very poor

functioning," and at other times he had better functioning. (Wactor Depo, J.A. at 213 - 214). By

March 11, 2010 Dr. Isakov referred him to Anderson Neuro ". . . with possible Parkinson's . . .

memory loss . . . thinking is slow, and he has trouble with words." They also noted dementia and

"some language difficulty." (Wactor Depo, J.A. at 211 - 212).

The records of the treating physicians support Nancy Wactor's testimony about his

developing cognitive problems in early 2010. Rick J. Keizer, M.D. last saw Mr. Wactor on

December 31, 2009, and referred him to Dr. Ingrid Isakov on January 5, 2010 ". . . for further

evaluation of the cognitive impairment." (Keizer Report, J.A. at 233). Dr. Isakov saw him on four

occasions from January 12 to March 23, 2010 and treated him for Parkinson's disease and other

problems, with history noted of cognitive problems, dementia, memory problems and confusion.

Regarding the issue of better lucidity/worse lucidity on various days, he scored 21 of 30 on his mini-

mental status in January, and improved to score 28 of 30 on February 23, 2010. Dr. Isakov referred

him to Dr. Reeves at Anderson Neurological Associates on February 23, 2010 "for dementia."

4

(Isakov Report, J.A. at 235). H. Dean Reeves, II, M.D. diagnosed him initially with mild cognitive impairment and later noted severe confusion. (Reeves Report, J.A. at 237).

During the months of January to May of 2010 Mr. Wactor continued to handle his own personal business affairs. He continued to drive in town. (Wactor Depo, J.A. at 217 - 218). He would also typically pick up the mail and any business papers. (Wactor Depo, J.A. at 201). Mr. and Mrs. Wactor handled their own finances separately. (Wactor Depo, J.A. at 203). Mr. Wactor continued to handle his own business and finances, including his mail, until he broke his foot and entered the hospital in May of 2010. (Wactor Depo, J.A. at 215, 230 - 231).

In May of 2010, with Mr. Wactor in the hospital, Mrs. Wactor became of aware of a couple of unpaid bills (AT&T and a credit card), which Mr. Wactor normally handled but which had been neglected. She then realized that over the course of the early months of 2010, Mr. Wactor's responses to business had been erratic, in that some matters he handled, and some he neglected. (Wactor Depo, J.A. 218 - 219, 225, 230 - 231). Among the business matters that he normally handled was the quarterly premium payments to Jackson National. (Wactor Depo, J.A. 203 - 205).

On June 11, 2010, concerned because of her recent discovery of two bills neglected by her husband, which he previously had handled, she contacted Jackson National, (Wactor Depo, J.A. 218 - 220). In that call she informed Jackson National of his medical problems. Jackson National informed her that the policy had lapsed. She offered to make up any payments. Jackson National refused to provide further information to her, stating that "we would need an owner of a policy to contact us for instructions..." Mrs. Wactor replied that she had a Healthcare Power of Attorney. Further information was refused by Jackson National. (Wactor Phone Tr., J.A. at 194 - 198). Having no information as to any amount which might be past due, Mrs. Wactor was unable to make

a payment. (And, as stated above, at that time Mr. Wactor was suffering from significant dementia and cognitive loss and was in the hospital).

Regarding her attempt to make payment to Jackson National, Mrs. Wactor testified:

Q.    When you called Jackson National Life in June 2010, if they had told you an amount to pay to reinstate the policy, would you have paid it immediately?

A.    Immediately.

(Wactor Depo, J.A. at 231).

Mrs. Wactor also testified "...if they had said that day that I could catch it up, I would have a check in the mail to them that day." (Wactor Depo, J.A. at 219 - 220). Nor did Jackson National send to Nancy Wactor any Reinstatement package, or even inform her of anything regarding right of Reinstatement. (Wactor Depo, J.A. At 230 - 231).

Jackson National maintains that it sent to William R. Wactor, by regular mail, a regular Payment Notice dated December 31, 2009; a Grace Period Notice dated February 4, 2010, and a Lapse Notice dated February 25, 2010. It is undisputed that Jackson National has no evidence that William R. Wactor ever received any of these.

Despite the 19 years of payments on this insurance policy, Jackson alleges that it only mailed two letters to William R. Wactor in 2010 prior to his death - a Grace Period Notice dated February 4, 2010 and a lapse Notice dated February 25, 2010. (depo tr. of Kevin J. Schweda) -

Q:    Were there any other notices in the year 2010 to Mr. Wactor that you're aware of?

A:    Not that I'm aware of.

(Schweda Depo, J.A. at 247).

6

Kevin J. Schweda is Jackson National's Customer Service Representative who reviewed the claim after William R. Wactor's death, after receiving the letter from Lisa Gunter (daughter of Nancy and William Wactor). He testified that Jackson National has a computer log, which he reviewed, which indicates that the two letters were sent by regular mail to Mr. Wactor. He admits that Jackson National has no information of whether Mr. Wactor actually received either notice. (Schweda Depo, J.A. at 246 - 247).

Regarding the two notices which Jackson National alleges it mailed in 2010, Nancy Wactor testified that she never saw either of them, nor any other correspondence from Jackson National, prior to Mr. Wactor's death. (Wactor Depo, J.A. at 227). Further, after learning of Jackson National's denial of the claim, she searched Mr. Wactor's office area and personal effects and found neither of the two notices Jackson alleges it mailed, nor any other premium notice or other correspondence. She located Mr. Wactor's file folder labeled "Insurance" but nothing was in it. (Wactor Depo, J.A. at 202, 207, 209, 221 - 222). Further, Jackson National's agent , Peter Brooks, never had called or contracted them regarding the late payment, grace period or lapse notice, nor anything else in 2010. (Wactor Depo, J.A. at 222 - 223).

Jackson's National's agent for Mr. Wactor's policy was Peter Brooks. Mr. Brooks was not the original agent who wrote the policy in 1991, but was Jackson National's servicing agent in recent years. He had contacted Mr. Wactor on multiple occasions prior to 2010, for matters including rates for various levels of coverage, amount of coverage, premium amounts, scheduling of payments, address changes, and similar issues. (Brooks Depo, J.A. at 275 - 284). Interestingly, on the Grace Period Notice and Lapse Notice which Jackson National alleges it sent to Mr. Wactor in 2010, Mr. Brooks' name and address are indicated thereon. Mr. Brooks is unable to state whether he received

7

a copy at that time. (Brooks Depo, J.A. at 275 - 277). In any case, Mr. Brooks never called or contacted Mr. Wactor in 2010 prior to his death. (Brooks Depo, J.A. at 286).

Regarding the same issue of mailing, it is undisputed that there exists no evidence of any kind that William R. Wactor or Nancy Wactor ever received either the Grace Period Notice or Lapse Notice at any time in 2010 prior to his death. All we have is the testimony of Customer Service Representative Kevin J. Schweda that the computer log information at Jackson National indicates that these were sent by regular mail. Nancy Wactor never saw them prior to his death, and did not find them in William's personal effects of files. Further, Jackson's agent Peter C. Brooks was unable to state whether he received copies of them, despite his name and address being indicated thereon.

Jackson National's initial response to Lisa Gunter's letter and the family inquiries was a letter from Jackson Vice President Charles F. Field, dated June 16, 2010, addressed to Nancy Wactor. (Jackson V.P. Charles F. Field letter, J.A. at 288). In 2010 Mr. Field was Vice President of claims for Jackson National. Despite there appearing to be his signature affixed to Jackson's National's letter of June 16, 2010, he admitted that in 2010, he: (a) had no involvement with the Wactor claim at any time in 2010; (b) never signed off on any review of the Wactor claim in 2010; (c) never gave any approval, written or verbal, of the denial of coverage in 2010; and (e) never reviewed the letter of the file at anytime in 2010. Rather, this letter, being the formal rejection of Mrs. Wactor's claim for coverage, was computer generated. (Field Depo, J.A. at 291 - 293, 306).

Q:    Why then does Jackson bother to affix your signature if you had no involvement and gave no actual approval at the time?

A:    It's just a company procedure to attach an officer's signature to system-generated correspondence regarding claims.

8

(Field Depo, J.A. at 293).

This initial formal rejection of the claim was computer generated. Mr. Field, the supposed signatory, never reviewed any of the Wactor issues or claim until "a couple of days" before his deposition taken on October 24, 2012. (Field Depo, J.A. at 291, 296, 306 - 307).

After the computer-generated claim denial of June 16, 2010 (not signed or reviewed by the alleged signatory), the claim was then "reviewed" by a Customer Service Representative Kevin J. Schweda. This review by Mr. Schweda, A Customer Service Representative, was never approved or reviewed by Mr. Field, nor anyone else at Jackson superior to Mr. Schweda.

Q:     The initial claim denial then, did anybody superior to Mr. Schweda actually review and approve his determination at anytime in the year 2010?

A:     I'm not aware of anyone.

(Field Depo, J.A. at 293-294).

As Mr. Field did no review of anything in 2010, we look to what Mr. Schweda later considered, in his determination of claim denial:

Q:     At that point in time, did you receive information at least informing you from the Wactor family that Mr. Wactor had had problems with dementia and cognitive impairment during the last five or six months of his life?

A:     Yes.

Q:     And did you consider that information in any decision making you did?

A:     No.

Q:     And what did you consider instead then?

A:     The termination date of the policy.

9

(Schweda Depo, J.A. at 244)

Mr. Schweda testified that he reviewed the computer system, confirming that the lapse for non-payment occurred before his death, and determined that notices were mailed and that there was no coverage.

Q:     Did you consider anything else when you make your review?

A:     No.

(Schweda Depo, J.A. at 245)

Mr. Field's review, which did not occur until "a couple of days" before his deposition of October 24, 2012, was no better, he testified that he then reviewed the letter of June 16, 2010 (which he never signed previously), reason for denial, a copy of a screen print from the computer system indicating the date the policy lapsed, and the date of Mr. Wactor's death.

Q:     Were there any other issues that you considered in your review? When I talk about
       the review, I'm talking about the review that took place in mid-2012. Did you look
       at any other issues in making your determination to approve the 2010 action?

A:     No.

(Field Depo, J.A. at 295).

He did not consider that the wife, Nancy Wactor, had telephoned Jackson on June 11, 2010, or the information about his dementia and cognitive loss, or the acceptance of late payments 22 times by Jackson National during the life of the policy.

Both Schweda and Field confirmed that Jackson National had accepted late payments some 22 times from the insured over the course of the policy. (Schweda Depo, J.A. at 261 and Field Depo, J.A. at 305). On these 22 prior occasions, Mr. Wactor had been late with payments and was allowed

10

to pay them, admittedly during the Grace Period. On these 22 prior occasions Mr. Wactor was able to make payment prior to the end of the Grace Period because he received the Notices of such, sent by Defendant.

Throughout these 22 occasions Defendant established a course of conduct, confirming (A) that Defendant would furnish Notices if a premium due date was missed; and (B) that Defendant would accept late payment (in accord with the information provided on the Notices).

Jackson National also has a "Privacy Policy" that it uses arbitrarily , without sufficient guidelines, and as both a sword and a shield, depending on what benefits Jackson National at any point in time. The Privacy Policy is relevant here because: (a) Nancy Wactor contacted Jackson National on June 11, 2010, asking to be informed of he amount of any late payment, if any, so that she could pay immediately, but was refused such information, on the basis of the policy. (Schweda Depo, J.A. at 253 - 255); and (b) Mr. Schweda admits that, had Nancy Wactor inquired about the status of the policy while the grace period was still in effect, under Jackson's policies and procedures, she would have been given no information. (Schweda Depo, J.A. at 270). Thus, Jackson National, in a situation of an insured with dementia, eliminates the ability of the policyholder or beneficiary to make effective use of the grace period.

Jackson National's self-serving Primary Policy includes the following :

> To the extent permitted by law, we may disclose to either affiliated or non-affiliated third parties all of the non-public personal financial information that we collect about our customers, as described above. (Jackson National Privacy Policy, J.A. at 309).

On the basis of its Privacy Policy, Jackson National deprived Nancy Wactor of information regarding any premium balance and thereby the ability to immediately send a check. Further, she

would not have been able to have obtained any such information had she requested such during the grace period. Both Mr. Schweda and Mr. Field testified that under Jackson's Privacy Policy, Jackson would not release such information to an insured's wife or beneficiary. (Schweda Depo, J.A. at 252 - 253).

Curiously, neither Mr. Schweda nor Vice-President Field could state who the "affiliated or non-affiliated third parties" were, to whom Jackson could provide "non-public personal financial information that we collect about our customers."

Q:    So what you're telling us then is you don't know who those non-affiliated third parties are that can receive this personal financial information; correct?

A:    Correct.

(Schweda Depo, J.A. at 254).

Mr. Schweda admitted that Jackson took the position that it would not provide such information to this insured's wife or beneficiary, but it could provide it to "non-affiliated third parties," although he could not identify such parties. (Schweda Depo, J.A. at 254 - 256).

Vice President Field concurred with Mr. Schweda on this point, and could not define or identify who the "non-affiliated third parties" were, who could receive such information. Nor could he identify any policies or procedures that could provide such guidelines.

Q:    Is there anything that you know of within the Jackson system that tells us who all of the non-affiliated third parties are that can receive this financial information?

A:    I'm not aware of anything.

(Field Depo, J.A. at 302).

12

In other words, Jackson National, when it arbitrarily chooses to do so, may take the position to deny information to an insured's wife who is also the beneficiary, but still arbitrarily give "all of the non-public personal information that we collect about our customers" to "non-affiliated third parties," for whom there are no guidelines or definitions. In this case, the insured was now age 74, suffering from dementia the last few months of his life, after paying premiums for 19 years. In this situation Jackson chose to deny information to the wife/beneficiary, while reserving the right to disclose the very same information to unaffiliated third parties that it cannot or will not identify.

Jackson also purports to provide reinstatement rights to its insured, but by its actions and arbitrary determinations, renders it a nullity. The Policy contains the following:

**HOW A POLICY IN DEFAULT MAY BE REINSTATED:**

**This policy may be reinstated within five years after the date of any past due premium. Reinstatement is subject to:**

> **(1)    receipt of evidence of insurability of the Insured satisfactory to the Company; and**
>
> **(2)    payment of all past due premiums with interest from the due date of each premium.**

**(General Provisions, p. 4).**

Nancy Wactor's telephone contact to Jackson National on June 11, 2010 was an effort to make use of the Reinstatement. Although she did not then know of the specific policy language, she provided information of his condition and asked the amount of any premium balance due, and offered to pay immediately. However, Jackson determined that at that point Mr. Wactor was "uninsurable" to its satisfaction. But without providing definition of "insurability", Jackson National can determine arbitrarily that its insured that its insured is no longer "insurable". For example, Jackson can decide

on any basis - such as advanced age alone - or any basis it arbitrarily chooses - to determine non-insurability, thereby nullifying the provision.

Over the course of the 19 years of premium payments made by Mr. Wactor, Jackson National actually received approximately $68,500. Over the 19 years, the benefit to Jackson National is about $178,000, or more if one assumes that it earned better than prime rate. (Finkel Depo, J.A. at 317).

**Expert Opinion of Gerald M. Finkel**

Plaintiff's Expert in Insurance Coverage and Bad Faith Practices is Gerald M. Finkel. Mr. Finkel has been Professor of Insurance Law at South Carolina's law schools for 32 years (1981 - 2006 at University of South Carolina School of Law and 2005 to the present at Charleston School of Law, longer than any other professor of insurance law in South Carolina (Finkel CV, J.A. at 386-391). Plaintiff respectfully requests that the Court give significant consideration to Professor Finkel's expert opinions, as expressed in his Expert Witness Supplemental Report (Finkel Report, J.A. at 374 - 384) and in his deposition (Finkel Depo, J.A. at 311 - 372). [1]

In this report Professor Finkel states

"...it is my opinion to a reasonable degree of professional certainty that Defendant did breach its contract in bad faith with Plaintiff." (Finkel Report, J.A. at 378).

Providing further detail, Professor Finkel concludes:

The Policy does not specify cancellation notice by regular mail. In South Carolina, unless the policy specifies cancellation notice by mail, actual receipt by the insured is a precondition of cancellation,. Because nothing in the record indicates that the Insured received the Defendant's notices, the cancellation was ineffective and coverage should have been provided. (Finkel Report, J.A. at 379).

_____

[1] F.R.E. Rule 704, Opinion on Ultimate Issue: ... testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issues to be decided by the trier of fact.

In support of this position Professor Finkel cites *Edens v. South Carolina Farm Bureau Mutual Insurance Co.,* 279 S.C. 377, 381-2, 308 S.E.2d 670, 671 (1983). Professor Finkel further discusses this requirement of proof of receipt of notice in his deposition.

> But in *Edens* the question is whether or not, absent language in the policy itself, that limits notice to mailing under the mailbox rule, there is a requirement to inform the insured as to a lapse... there has to be a proof of receipt...So whether or not is was actually received is a burden on the carrier. (Finkel Depo, J.A. at 318).

Professor Finkel further notes that Jackson National "...undertook a duty, though, to inform them,..you take a duty then you have to do it correctly." (Finkel Depo, J.A. at 341).

Further, Professor Finkel notes that there was first a Grace Period Notice (which provides that payments may be made to catch up the policy, without new evidence of insurability or other requirements), and a subsequent Lapse Notice.

> ...the lapse notice says that we have given you notice. We have given you notice. That's the language of these letters. So, as I say, they undertook a duty to do the same thing, basically, that writing it into the policy would have done. (Finkel Depo, J.A. at 344).

Professor Finkel also notes:

The insured's insurability, however is irrelevant because Defendant's lapse notice waived all requirements other than receipt of the past due premiums by March 26, 2010. This waiver is important when viewed in the context of Defendant's failure to ensure actual receipt of the lapse notices, its refusal to communicate with Plaintiff, and the notice Defendant had that Plaintiff was willing and able to remit the past due premium amount. If Plaintiff had known of the lapse prior to March 26, 2010 and was able to remit the past due payments by that date, a different outcome would have ensued - contrary to Defendant's assertion. Defendant's actions were unreasonable under the circumstances, indicating a breach of the implied covenant of good faith and fair dealing. (Finkel Report, J.A. at 381).

Professor Finkel also finds bad faith, and states:

The Defendant denied benefits and processed the claim in bad faith. (Finkel Report, J.A. at 379).

Further Professor Finkel notes:

It is not necessary, however for an insurer to breach an insurance contract to be held liable for a bad faith refusal to pay benefits due an insured. Improper claims processing will sustain such a cause of action. (Finkel Report, J.A. at 380).

Professor Finkel cites *Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 504, 473 S.E. 2d 52, 55 (1996) and *Univ. Med. Associates of the Med. Univ. Of South Carolina v. Unum Provident Corp.*, 335 F.Supp. 2d 702, 708-09 (D.S.C. 2004) in support of the above.

In summary, Professor Finkel testified:

Q:    ...Do you find that there are separate and distinct causes of action by the Wactor case, both for the underlying coverage claim as well as the bad faith claim, due to the claims practices?

A.:    Yes.

Q.:    And that whether or not the underlying coverage claim is upheld or denied at some point, is there still a viable bad faith claim regardless of that issue?

A:    In my opinion, there is.

(Finkel Depo, J.A. at 371 - 372).

16

## SUMMARY OF ARGUMENT

1)      The Defendant, through its actions on 22 prior occasions, established a course of conduct upon which the insured was entitled to rely.

2)      On the 22 prior occasions the Defendant actually furnished Notices to the insured.

3)      The Notices issued on the 22 prior occasions informed the insured of a Grace Period deadline, by which time payments must be received.

4)      On the 22 prior occasions, the insured paid the late payment by the Grace Period deadline, having been informed of same.  (Mr. Wactor was suffering from dementia in the first half of 2010, but did take care of some business and bills appropriately, but neglected other business and bills.)  Also, for the credit card and AT&T bills, Mrs. Wactor found the payment due correspondence and paid them.

5)      Considering Defendant's sole evidence of its computer information system showing mailings, and the established flaws and fraud within such system, and Plaintiff's evidence of no receipt of Notices, there are ample factual inferences to be submitted to the jury, on all issues regarding alleged mailing, furnishing of Notices, and waiver.

6)      Had proper Notices been furnished to Mr. Wactor, either he or Mrs. Wactor would have been informed of the grace period deadline and the amount due, and could have paid it.

7)      The earlier Notices, on the 22 prior occasions, contained no requirement for proof of insurability, only that the amount in question be paid by the date specified.  Had Mr. or Mrs. Wactor received such, payment could have been made.

8)      On June 11, 2010, when Mrs. Wactor called Jackson National and asked about any amount due, she was denied that information.  Having neither seen or received any Notice of a grace

period deadline, she was unable to have made use of such crucial information so as to pay any late payments. Further, she testified that on June 11, 2010 she would have immediately made any payment, had the Defendant not withheld the information. A simple wire transfer that day would have resolved the payment.

Ample material evidentiary questions exist and must be submitted to a jury for determination. The factual issues include Waiver, furnishing of Notice, receipt of Notice, Bad Faith of the Defendant, Estoppel, and the Duty of Good Faith and Fair Dealing. The granting of Summary Judgment should be denied, and the case should proceed to a jury trial for factual determinations.

## STANDARD OF REVIEW

This Court reviews a district court's granting of summary judgment *de novo* in the light most favorable to the non-moving party. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 694 (4th Cir. 2007); *Simmons v. Poe*, 47 F.2d 1370, 1378 (4th Cir. 1995). Accordingly, the Court must consider the pleadings and all allegations and determine whether there is a genuine issue of material fact to be submitted to a trier of fact. Fed.R.Civ.P. 56(c). A Court may not "try the case in advance by summary judgment." *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951).

Where an insurance policy ambiguity creates a genuine issue of material fact as to the parties' intent, then summary judgment must be denied and the case must proceed to trial. *Blis Day Spa, LLC v. Hartford Ins. Group*, 427 F.Supp.2d 621 (W.D.N.C. 2006)(citing *Gen. Accident Fire & Life Assurance Corp. Ltd. v. Akzona, Inc.*, 622 F.2d 90 (4th Cir. 1980)). In reviewing the District Court's summary judgment order, an appellate court "must assess the evidence as forecast in the documentary materials before the court in the light most favorable to the party opposing the motion" and accept the non-movant's version of all that is in dispute. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

19

## DISCUSSION OF ISSUES

1.    <u>Questions of fact exist regarding waiver and the requirement for mailing notices and whether notices were received by the insured.</u>

Waiver is a factual issue, to be determined by a jury.  In this case, Receipt of Notice is also a factual issue, which must be determined by a jury.

Defendant undertook the duty of Notice, by and through its established course of dealing, by actually providing Notice, with Mr. Wactor actually receiving Notice, on 22 prior occasions.  Per the strict terms of the policy, arguably Defendant did not initially have the duty of providing the Notice; yet over the 19 years, it undertook the duty of Notice through its established course of dealing.

Having undertaken the duty to provide Notice through the course of dealing, Jackson National had the duty, in January to March of 2010, to furnish the Notice to Mr. Wactor.  Due to his dementia, the actual furnishing of the Notice to Mr. Wactor became even more crucial.

Mrs. Wactor and her daughter searched diligently for any such Notice and found none.  There is an inference that no Notice was received, and perhaps none sent.

Defendant, through its prior course of dealing 22 times, established the duty of not only sending, but actually furnishing, Notice to Mr. Wactor.  Mr. Wactor and his beneficiary are entitled to rely upon such established duty.

It is well-established in South Carolina that a contract of insurance may be modified by a course of dealing, and that the parties are justified in relying on the terms thus established.  *See Carolina Aviation v. Glens Falls Ins. Co.*, 214 S.C. 222, 230-1, 51 S.E.2d 757, 761 (1949) (holding that the terms of the contract "may be implied from custom and usual forms and former course of dealing."). "'A usage or custom to be recognized by law must be long standing, general in its

20

operation, known to, and acquiesced in, by all whose rights are affected by it, and be just and reasonable in its operation.'" *Keith v. River Consulting, Inc.*, 365 S.C. 500, 506, 618 S.E.2d 302, 305 (Ct. App. 2005) (citations omitted). "If evidence is presented to support a specific trade usage that may resolve an ambiguity or matter on which the contract is silent, "'[w]hether the existence of a particular custom or usage has been satisfactorily shown by the evidence is ordinarily a question of fact, which ... is to be determined, like other factual questions, by the jury.'" *Id.* (citations omitted). The failure of insurer to give formal notice to its insured is a circumstance to be considered, along with other evidence in the case, on the subject of waiver by the insurer of its right to have policy declared void. *See Dubuque Fire & Marine Ins. Co. v. Miller*, 219 S.C. 17, 29, 64 S.E.2d 8, 13 (1951) (citations omitted). The full and proper consideration of the evidence of Jackson National's self-imposed requirement to provide and verify notice of cancellation is based on one of the most fundamental precepts of South Carolina insurance law:

> Forfeitures are not favored in the law, and courts, in order to avoid the odious results of a forfeiture, are not slow in seizing hold of such circumstances as may have been acted on in good faith, and which indicate an agreement on the part of the company or an election to waive strict compliance with the conditions and stipulations in the policy... One party to a contract will not be permitted to make a show of continued leniency, or a pretense of liberality, repeated with such uniformity as to put another off his guard, and afterwards, by a sudden change in his course of conduct, declare a forfeiture, where the other party is helpless to avert the consequences.

*Palmer v. Sovereign Camp, W. O. W.*, 197 S.C. 379, 15 S.E.2d 655, 661 (1941).

Underlying the decision in *Edens v. South Carolina Farm Bureau Mut. Ins. Co.*, 279 S.C. 377, 208 S.E.2d 670 (1983) is that ambiguities must be resolved in favor of the insured. The Court clearly stated that, "[w]here a cancellation clause provides that the insurer may cancel by mailing the notice to the insured's address...the mere mailing is sufficient to effect cancellation. *Id.*, 279 S.C.

21

at 379, 208 S.E.2d at 671. If the above is true, so is the inverse: where the policy does *not* provide cancellation by mailing the notice, the mere mailing is *not* sufficient. Although it did not address the specific instance where a policy is silent as to mailing notice, the *Edens* Court restricted the insurer's ability to cancel by written notice by requiring actual receipt as a condition precedent to cancellation. *Id.*, 279 S.C. at 380.

Here, it is undisputed that there was no express notice requirement in the Policy, and certainly no provision for the sufficiency of mailing of such notice. Equally undisputed is that Jackson National nevertheless provided written grace period and lapse notices to its insured approximately twenty-two (22) times over the nineteen year history of the Policy, (Schweda Depo, J.A. at 261), thereby waiving its right to cancel without notice. "'An insurer may waive, or be estopped to assert, a ground for avoidance or forfeiture of a policy, and courts are prompt to seize any circumstances which indicate a waiver on part of insurer.'" *Dubuque*, 219 S.C. at 27, 64 S.E.2d at 12 (citations omitted). The question of waiver is properly submitted to jury, where all facts taken together warrant inference of waiver. *See Allen v. Jefferson Standard Life Ins. Co.*, 139 S.C. 41, 137 S.E. 214 (1927). There are clearly questions of fact regarding the course of dealing in which the parties engaged and the waiver of Jackson National's right not to provide notice of cancellation, making summary judgment improper and premature.

Further, Jackson National misstated when it asserted that the presumption of mailing is un-rebutted and undisputed. First, the fact that the insured made late premium payments approximately twenty-two times in the past strongly indicates the insured's knowledge that his Policy was in danger of lapse on those occasions; whereas the failure to make the last two payments indicates the lack of such knowledge. Additionally, neither the Plaintiff nor her daughter located the alleged grace and

lapse notices in question after a diligent search through the insured's effects. (Gunter Depo, J.A. at 394 - 395; Wactor Depo, J. A. 206 - 209). Finally, Jackson National admitted that its only evidence that any notices were sent to the insured was a copy of the notices and a history log entry; no independent confirmation of receipt or mailing are available to date. (Schweda Depo, J.A. at 246 - 247). Because material questions of fact exist about the mailing of the subject notices, summary judgment is inappropriate.

Material issues of fact exist as to Waiver by Defendant, whether the Notices were mailed, and whether they were received. In the present case the issue of Waiver appropriately should be submitted to the jury, including the factual determination of whether the Defendant established a course of dealing upon which the insured (and/or his family) could rely.

The established course of dealing, whereby Defendant on 22 prior occasions furnished Notices, is crucial. Such Notices (A) informed the insured of the payment due; (B) informed the insured of the grace period deadline date by which the payment must be made; and (C) made it clear that no evidence of insurability (as was required in the Reinstatement provision – see Plaintiff's Memorandum in Opposition to Summary Judgment, J.A. at page 181) was necessary.

The established course of dealing, including the actual furnishing of Notices with the above-referenced information, and the insured's reliance upon same, and factual issues of Waiver, are all matters to be resolved by the jury.

Whether Defendant actually furnished Notice to the insured in the early months of 2010 (as it had done on the prior 22 occasions), is a question for the jury.

23

Defendant relies solely upon a computer log in its argument that Notice was mailed. Defendant has no other evidence. As to the issue of actual furnishing of the Notice to the insured, or the next issue of receipt of the Notice by the insured, Defendant provides no evidence of any kind.

Plaintiff shows the following:

(1)    Mr. Wactor's wife and daughter made diligent searches of the area in the house in which Mr. Wactor kept his business and financial papers and mail, and found no Notices of any kind, nor any correspondence reflecting any missed premium payment or any grace period deadline date, nor any evidence of any unpaid payment.

(2)    Mr. Wactor failed to make the two payments due in early 2010, which is in stark contrast to the 22 prior occasions, over 15 years, of late payments being made by the Grace Period deadline date. In each of those 22 prior occasions the Grace Period deadline date was provided in the Notice.

(3)    Jackson National's agent Peter Brooks was shown on the alleged Notices in February and March of 2010 as the servicing agent. Mr. Brooks acknowledged his name appearing on copies of the alleged Notices presented to him at his deposition, but he was unable to state whether he received a copy of the Notices in 2010. Mr. Brooks had contacted Mr. Wactor on multiple occasions prior to 2010, for matters including rates for various levels of coverage, amount of coverage, premium amounts, scheduling of payments, address changes and similar issues. However, Mr. Brooks did not call or contact Mr. Wactor regarding the late payment or anything else in 2010 prior to his death. (Brooks Depo, J.A. at 274 - 286).

24

(4)    Jackson National's information system is suspect and erroneous and cannot be relied upon. As evidence of mailing of the alleged Notices in February and March of 2010, Defendant relies solely upon its information system (i.e., its computer log which they allege shows mailing). However, Jackson's information system is flawed, suspect and erroneous, and cannot be relied upon.

    (a)    Jackson's information system sent a letter to Nancy Wactor, dated June 16, 2010 (after Mr. Wactor's death), allegedly from Jackson V.P. Charles F. Field (Field Letter, J.A. at 288). The letter claimed that Vice President Field had performed a review of the claim (allegedly reviewing the earlier determination to reject any claim). The letter bore an alleged signature of Mr. Field. The letter was "computer-generated," according to Mr. Field and Mr. Schweda. In fact, the letter was fraudulent. No such review of any kind had been made by Mr. Field at that time, nor any time until the eve of his deposition two years later. Mr. Field admitted that, in direct contrast to what Jackson's computer-generated letter claimed, he had had no involvement of the Wactor claim at any time in 2010, he had never signed the letter, had never given any approval of any kind, and had never reviewed any aspect of the Wactor file at any time in 2010. Despite this fraud now known to be in Jackson's computer information system, it is solely the computer information system upon which Jackson now relies. (Field Depo, J.A. at 291 - 296, 306 - 307).

25

(b)    Despite the computer information system showing Peter C. Brooks as servicing agent on the alleged Notices, Mr. Brooks is unable to state whether he was furnished copies of them. Further, Jackson National is unable to state whether it mailed or furnished copies to Mr. Brooks.

(c)    Jackson's computer information system contains a "Privacy Policy" which states that ". . . we may disclose to either affiliated or non-affiliated third parties all of the non-public personal financial information that we collect about our customers . . . ." Jackson advances its "Privacy Policy" to justify the refusal by the telephone clerk on June 14, 2010 to provide to Mrs. Wactor the requested information about any sums due. Yet Jackson V.P. Charles Field was unable to state who the "affiliated or non-affiliated third parties" were, to whom Jackson could provide "non-public personal financial information that we collect about our customers." Nor was Customer Service Representative Kevin Schweda, who allegedly reviewed the Wactor claim, able to state who such parties were. (Field Depo, J.A. at 302, and Schweda Depo, J.a. at 252 - 256). Jackson National interprets this "Privacy Policy" arbitrarily, to serve its own purposes at any given time. It uses the Policy to attempt to justify denial of crucial information to Mrs. Wactor, who inquired and was willing to immediately pay any past due premium on June 11, 2010 when she called.

Despite these flaws, including outright fraud (letter allegedly of Charles F. Field of June 16, 2010), in its computer information system, it is solely this computer information system upon which Jackson relies to attempt to show a mailing.

All of the evidence, including Plaintiff's evidence, taken together, provides inferences sufficient for jury consideration

2.    Questions of fact exist regarding whether Jackson National acted in bad faith.

Jackson National correctly states that South Carolina recognizes four elements to a bad faith denial of benefits claim: "'(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured;'" *Cock-N-Bull Steak House, Inc. v. Generali Ins. Co.*, 466 S.E.2d 727, 730 (S.C. 1996) (citations omitted), and further, "[b]ad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim....[A]n insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." *Doe v. South Carolina Medical Malpractice Liability Joint Underwriting Ass'n.*, 347 S.C. 642, 649, 557 S.E.2d 670, 674 (2001) (citations omitted). All of Jackson National's arguments that it had a reasonable basis to deny benefits, however, are based on the same assertion on which it has relied throughout—that because the premium payment was not made prior to the Policy's lapse date, no Policy existed at the time of the claim—and no further inquiry was needed.

The problem with Jackson National's argument is that there are unresolved questions of fact regarding whether the Policy was effectively cancelled as discussed above. If the cancellation was

27

ineffective because it was improperly noticed, then the Policy was in full force at the time of the

claim. Plaintiff agrees that review of Jackson National's conduct "must be judged by the evidence

it had before it at the time it denied the claim." *Univ. Med. Assocs. of the Med. Univ. of S.C. v.*

*UnumProvident Corp.*, 333 F. Supp. 2d 479, 486 (D.S.C. 2004). Jackson National knew when it

denied benefits that there was a question whether its insured had knowledge of the Policy's lapse,

but resolutely refused to consider anything other than the unpaid premium. It is Jackson National's

knowing failure to exercise honest, informed judgment regarding its denial that makes its basis

unreasonable.

Further, Jackson National acknowledges that South Carolina recognizes a bad faith cause of

action for an insurer's improper claims practices, separate and apart from the existence of any breach

of contract. This tort is based on the holding that:

> there is an implied covenant of good faith and fair dealing in every insurance contract
> 'that neither party will do anything to impair the other's rights to receive benefits
> under the contract.'... [I]f an insured can demonstrate bad faith or unreasonable
> action by the insurer in processing a claim under their mutually binding insurance
> contract, he can recover consequential damages in a tort action.... 'Implicit in the
> holding is the extension of a duty of good faith and fair dealing in the performance
> of all obligations undertaken by the insurer for the insured.'

*Doe*, 347 S.C. at 649, 557 S.E.2d at 674 (citing *Tadlock Painting Co. v. Maryland Cas. Co.*, 322

S.C. 498, 500–1, 473 S.E.2d 52, 53 (1996)). S.C. Code § 38-59-20 provides indicia of such

improper practices, establishing a standard of care:

> (3) Failing to adopt and implement reasonable standards for the prompt investigation
> and settlement of claims, including third-party liability claims, arising under its
> policies.

> (4) Not attempting in good faith to effect prompt, fair, and equitable settlement of
> claims, including third-party liability claims, submitted to it in which liability has
> become reasonably clear.

28

Within the implied covenant of good faith and fair dealing is the insurer's duty to investigate a claim. *Flynn v. Nationwide Mut. Ins. Co.*, 281 S.C. 391, 395, 315 S.E.2d 817, 820 (Ct. App. 1984).

Although Jackson National argues in great detail why certain telephone calls and letters between the parties cannot constitute bad faith claims handling, it ignores evidence clearly raising material questions of fact as to whether it met its duties to properly investigate and handle this claim. For example, the assistant vice president of claims for Jackson National testified that: 1) he was aware of no-one at Jackson National, other than customer relations representative Kevin Schweda, who reviewed or conducted any investigation into the claim; and, 2) the denial letter was a computer-generated letter based solely on comparing the Policy lapse date and the insured's date of death. Mr. Schweda testified that: 1) it was Mr. Fields' office that initially denied the claim and that he did not know who in claims administration denied it (Schweda Depo, J.A. at 241 - 242); and 2) after he became involved in the claim, he reviewed nothing but the information contained in Jackson National's computer system regarding the Policy lapse prior to the insured's death. (Schweda Depo, J.A. at 244 - 246. 15:3-17:2). Mr. Schweda subsequently confirmed Jackson National's position that no further investigation would be conducted despite having notice that the insured's cognitive ability was in question. (*See* Letter from Kevin J. Schweda to Nancy Wactor, dated July 23, 2010). Importantly, despite repeated requests Jackson National has not produced, nor will even acknowledge the existence of, a claims-handling manual or other procedure demonstrating its adoption of reasonable standards for the prompt investigation and settlement of claims.

The evidence above is by no means an exhaustive list of all the facts calling into question the reasonableness of Jackson National's claims practices; on the contrary, this very brief sample serves

to illustrate the wide range of facts that remain to be weighed, and that summary judgment is improper.

Finally, Jackson National's argument that the Plaintiff cannot bring a bad faith claim ignores Plaintiff's status as personal representative of the insured's estate, which was pled in paragraph two of the Complaint filed in this matter and admitted in Jackson National's Amended Answer. Mrs. Wactor, as personal representative, stands in the shoes of the deceased; who, as the insured, may bring a first party bad faith claim under *Nichols v. State Farm Mut. Auto Ins. Co.*, 279 S.C. 336, 306 S.E.2d 616 (1983).

3.    Questions of fact exist whether Jackson National should be estopped from cancellation.

In appropriate circumstances, estoppel can be used to prevent the insurer from denying coverage to the insured. *Koren v. Nat'l Home Life Assurance Co.*, 277 S.C. 404, 407, 288 S.E.2d 392, 394 (1982). As mentioned previously, courts are prompt to seize any circumstances which an insurer may be estopped to assert a ground for avoidance or forfeiture of a policy. *See Dubuque, Palmer, supra.* "After knowledge of a breach of the conditions of a contract of insurance by the insured, the insurance company by its acts may waive such breach." *See Allen, supra.* In order to prevail on a claim of estoppel, the insured must demonstrate: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reasonable reliance on the other party's conduct; and (3) a prejudicial change in position. *Provident Life & Accident Ins. Co. v. Driver*, 317 S.C. 471, 477, 451 S.E.2d 924, 928 (Ct.App.1994).

Jackson National short-changes Plaintiff's basis for estopping the enforcement of the cancellation of the Policy. Plaintiff alleged in the Complaint and offered evidence that during the relevant period the insured suffered from decreased mental capacity which resulted in his inability

30

to properly manage his business affairs. Plaintiff further alleged, and the evidence demonstrates, that she attempted to ascertain the status of the Policy, and if necessary, to cure any breach that may have occurred. Jackson National refused to communicate with Plaintiff, concealing all meaningful information regarding the status of the Policy other than their position that the Policy had lapsed due to non-payment.

In addition to the questions of fact regarding Jackson National's waiver and the lack of cancellation notice described above, there are material factual issues regarding the inequitable and self-serving application of the privacy policy that preclude summary judgment. Jackson National cited the "privacy laws" and its internal privacy policy to deny Plaintiff the information needed to pay the premium. First, no "privacy law" has ever been cited which would have prevented Jackson National from cooperating with the Plaintiff. More importantly, Jackson National's privacy policy did not prohibit communication with the Plaintiff; rather, it specifically stated that information may be released to affiliated or non-affiliated third parties in order to service the insured's account. (*See* Ex. 11, Privacy Policy). Additionally, Jackson National's internal procedures permit the disclosure of Policy information to third parties with supervisory approval or if the Policy premiums are paid by bank draft. (Associate Handbook *revised* 5/12/10, Section IV, p. 18 "Privacy and Confidentiality"; Life Financial manual, p.12).

Jackson National cannot rest on the argument that the lapse date had passed by the time Plaintiff offered to make the premium payments, because Jackson National would not have communicated or cooperated with Plaintiff at *any* time—based on the assertion that its privacy policy prohibited such communication. (Schweda Depo, J.A. at 270). Even if Plaintiff had attempted to make the payment on behalf of the insured prior to the lapse date, Jackson National would have

31

refused to provide the necessary information. (*Id.*). Jackson National prohibited anyone from protecting an insured's interests in the event that an insured was unable to do so for themselves. (Schweda Depo, J.A. at 268). Thus, not only did Jackson National improperly notice the cancellation of the Policy, it prevented Plaintiff from having any ability to resolve the lapse by arbitrarily applying its internal procedures to its advantage.

4.      Questions of fact exist whether Jackson National acted in good faith.

As described above, the implied covenant of good faith and fair dealing is a well-established component of South Carolina insurance law. *Doe v. South Carolina Medical Malpractice Liability Joint Underwriting Ass'n*, 347 S.C. 642, 557 S.E.2d 670, (2001); *Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 473 S.E.2d 52 (1996); *Flynn v. Nationwide Mut. Ins. Co.*, 281 S.C. 391, 315 S.E.2d 817 (Ct. App. 1984). There are myriad material questions surrounding Jackson National's conduct in this matter, including, *inter alia*, its failure to provide proper notice of cancellation, its failure to properly investigate the claim, its failure to fairly administer its own procedures, and its failure to adopt and implement reasonable standards for the prompt investigation and settlement of claims. It is clear just from the few examples listed in this brief that there are significant issues regarding Jackson National's alleged breach of the covenant of good faith and fair dealing requiring determination by a jury; therefore, summary judgment is improper.

## CONCLUSION

Summary Judgment is only proper when no material facts are in dispute. There are many material facts in dispute in this case pertaining to the acts or omissions of Jackson National, which are relevant to Plaintiff's causes of action. These material facts include the Defendant having established a course of dealing with the Plaintiff over many years, including the actual furnishing of late Notice to the Plaintiff on 22 occasions, receipt of such Notice by the Plaintiff, and actual payment made by the Plaintiff and received and accepted by the Defendant. The material facts also include the diligent searching by Plaintiff and her daughter for any premium Notices and finding none. The material facts also include Mrs. Wactor's phone call to the Defendant on June 11, 2010, seeking information (which would have allowed her to immediately pay any balance due), but being denied information on the basis of an ambiguous "privacy" policy that allows Defendant arbitrarily to grant or deny access to such information as it pleases. Further, the material facts include the failure of the Defendant to appropriately review the claim in 2010, and instead, issuing a fraudulent letter falsely claiming that the Vice President reviewed the claim, although such never occurred (supporting the claims of Bad Faith and violation of the implied covenant of good faith and fair dealing). These material facts in dispute support Plaintiff's causes of action. Summary Judgment must be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Appellant requests oral argument in this matter. Due to the sharp disagreements between the parties on both the facts and law, Appellant believes oral argument will benefit the Court in clarifying and resolving the disputed issues.

Respectfully submitted,

January 21, 2014                          s/Gary W. Poliakoff
                                         Gary W. Poliakoff (Fed. I.D. #3078)
Spartanburg, SC                          atty@gpoliakoff.com
                                         Raymond P. Mullman, Jr. (Fed. I.D. #6768)
                                         rmullmanjr@aol.com
                                         POLIAKOFF & ASSOCIATES, P.A.
                                         215 Magnolia Street
                                         P. O. Box 1571
                                         Spartanburg, SC  29304
                                         (864) 582-5472
                                         (864) 582-7280 (fax)

                                         Attorneys for Plaintiff

## CERTIFICATE OF FILING AND SERVICE

I certify that on the 21st day of January, 2014, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Charles F. Turner, Esq
Turner Padget Graham & Laney
P.O. Box 1509
Greenville, SC 29602
(864) 552-4628

Attorneys for Appellee Jackson National Life Insurance Company

I further certify that on this 21st day of January, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be filed with the Clerk of Court.

s/ Gary W. Poliakoff
Gary W. Poliakoff
POLIAKOFF & ASSOCIATES, P.A.
215 Magnolia Street
P. O. Box 1571
Spartanburg, SC  29304
(864) 582-5472

Attorney for Appellant Nancy K. Wactor

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. _____        Caption: _____

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

    [ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____